IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MANUEL MARTINEZ RAMOS<br>#37563-053 | :<br>:<br>: |
| v. | CIVIL ACTION NO.  CCB-06-735 |
| WARDEN | :<br>: |

**MEMORANDUM**

On March. 20, 2006, the court received a letter from Manuel Martinez Ramos, a federal prisoner then incarcerated at the Federal Correctional Institution, Cumberland, Maryland, stating that he was entertaining thoughts of suicide and engaging in a hunger strike.[1]   Plaintiff further alleged that prison staff were torturing him "by force feeding [him] by using tubes on my nose and this is a serious violation to the 8th Amendment of the US Constitution." Paper No.1.[2]   Plaintiff contended staff at FCI Cumberland "do not respect my constitutional rights and I'm asking your attention at least because of my age since this abuses and violations [sic] seem to be attempting to kill me by  the Federal Bureau of Prisons." Id.

The court construed the letter as a complaint for injunctive relief pursuant to Bivens v. Six Unknown Named Narcotic Agents, 403 U.S. 388 (1971) and directed the United States Attorney for the District of Maryland to respond.  Respondent filed a response and verified exhibits in support

---

[1]   Plaintiff was sentenced on June 1, 1993, to 211 months imprisonment after he was convicted of Conspiracy to Distribute more than Five Kilograms of Cocaine in violation of 21 U.S.C. § 841(a)(1); Distribution of More than Five Kilograms Cocaine in violation of 21 U.S.C. § 841(a)(1); and Aiding and Abetting in violation of 21 U.S.C. §841(a)(1) and 18 U.S.C. §2.  See Criminal Action No. HFM-92-20, United States v. Ramos (D. Md. 1993).  His projected release date is October 17, 2007.  Paper No. 3, Exhibit 1, Attachment A at 4.

[2]   The pleading, written in Spanish, was translated into English.

of dismissing the complaint. Paper No 3.  Subsequently, counsel filed a Motion to Dismiss the action as moot and submitted an affidavit and exhibits in support to show plaintiff voluntarily ended his hunger strike. Paper No. 4.  Plaintiff was provided notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), but has not filed a reply to the response.  On April 19, 2006, however, plaintiff submitted a letter to the court, stating that he was in solitary confinement and requested the court's help.[3]

Upon review of the pleadings, exhibits, and applicable law, the court determines that a hearing is not necessary.  See Local Rule 105.6.  The complaint will be dismissed as moot.

I. Background

Plaintiff, who has a history of engaging in hunger strikes, began the instant self-imposed hunger strike on February 25, 2006.[4]  His motive for this hunger strike was unarticulated, although he had demanded that he receive his health care only from the Mayo Clinic in Minnesota.

---

[3]  The letter, translated by court personnel, reads:

> I 'm in solitary 24 hours. How do I defend myself. Tell me. I lasted 39 days in hunger strike, ate due to rupture of stomach w/tubes. No family.  How can I defend  myself or how can you help me?

Paper No. 6.  Counsel for respondent indicates that the discipline process for which plaintiff was placed in the special housing unit has been exhausted.  Plaintiff was determined to have committed the charged prohibited act, and his security level has been returned to "High."  As a result, the BOP transferred plaintiff to the United States Penitentiary at Lewisburg, Pennsylvania on May 1, 2006. Paper No. 7 ¶ 6.

[4]  In August and September of 2004, Plaintiff engaged in a hunger strike while he was an inmate at USP Lee County, Virginia and he was fed by NGT.  Paper No. 3, Exhibit 2, Attachment A.  On August 17, 2005, after his transfer to FCI Cumberland,  Plaintiff declared a hunger strike because he wanted housing in a single inmate  cell. Paper No. 3, Exhibit 2, at 3  ¶ 7; see  also Exhibit 2, Attachment B.

Declaration of Dr. Lisa Morehead, Chief Psychologist, FCI Cumberland.[5] Paper No. 3, Exhibit 1 at 3 ¶. During his incarceration, plaintiff has received extensive psychological care and counseling in an attempt to:

> ...get at the root problem and motivation of his actions so that staff may formulate an appropriate treatment plan. He tends to repeatedly engage in a pattern of self-defeating behavior, reporting a medical problem for which he has already been offered and [he has then] refused appropriate treatment (left inguinal hernia, rectal bleeding, knee problems), repeats the medical complaints and the lack of satisfactory resolution to the problem and then engages in a hunger strike as a form of protest."

Id. at  ¶ 9; see also Exhibit 1, Attachment B.  Plaintiff has been diagnosed as manifesting "some indications of a paranoid personality disorder."  Exhibit 1 at 4, ¶ 10. At times, he exhibits a "psychological investment in battling the system" and at other times "[i]nmate Ramos is clearly engaging in hunger strikes in an effort to manipulate the system." Id. at ¶¶ 11 & 12.

On February 28, 2006, after plaintiff refused his ninth meal, medical staff started to monitor his vital signs. Paper No. 3, Exhibit 2, Attachment D.[6]  On March 6, 2006, he was moved to the Health Services Unit for observation.  See id. Plaintiff was advised of the adverse medical consequences of refusing to eat. See id. On March 7, 2006, prison staff administered intravenous hydration to plaintiff in order to stabilize plaintiff's blood chemistry.  See id.  On March 9, 2006, plaintiff attempted to cut himself.  See id., Exhibit 2, Attachment K.  He was put in ambulatory restraints to prevent further injury and placed on a suicide watch.  See Paper No. 3, Exhibit 1,

---

[5] Dr. Morehead is familiar with plaintiff's case as a treating psychologist, in her capacity as Chief Psychologist, and as translator for plaintiff because she is fluent in Spanish. Paper No. 3, Exhibit 1 at 3, ¶ 7. Dr. Morehead also was involved in plaintiff's temporary transfer to the Federal Medical Center in Rochester, Minnesota, where plaintiff underwent a psychiatric evaluation in September of 2005. See id., see also Exhibit 1, Attachment D.

[6] The Bureau of Prisons has published rules to address the issues that may arise when an inmate is on a hunger strike. See 28 C.F.R. 549., Subpart E, Inmate Hunger Strikes.

3

Attachment B. Subsequently, he was evaluated and determined not at immediate risk of suicide. See id. at Attachment C.

On March 10, 2006, Clinical Director Mohamed Moubarek, M.D. determined that it was medically necessary to begin feeding plaintiff through a nasogastric tube (NGT). See Declaration of Mohamed Moubarek, M.D., Paper No. 3, Exhibit 2, at 10 ¶ 37. Plaintiff had refused 39 consecutive meals, appeared dehydrated, and his creatine level and creatine clearance showed signs of kidney deterioration. See id; see also Exhibit 2, Attachment D. This decision was also based on plaintiff's age, weight, nutritional requirements, prior history of extended hunger strikes, the duration of his present hunger strike, and the absence of any indication that plaintiff would agree to eat a meal or drink nutritional supplements on his own accord. [7] See id.

Plaintiff continued his hunger strike, refusing to eat or allow medical staff to evaluate his condition. See id., at 11, ¶ 38, see also Attachments L & M. On March 15, 2006, Dr. Moubarek determined it was medically necessary to increase plaintiff's NGT feedings to twice a day. See id., at ¶ 39. Plaintiff refused to comply, and a calculated use of force was administered to remove him from his cell. Paper No. 3, Exhibit 3 at 3¶ 13. Plaintiff was placed in soft ambulatory restraints in an upright position so as not to interfere with the NGT. See id; see also Exhibit 2, Attachments D & N. Twice daily, plaintiff was fed through the NGT tube until March 17, 2006, when he began to drink two cans of Ensure, a nutritional supplement, on his own. See id. He refused, however,

---

[7] If an inmate's refusal to eat results in inadequate intake or abnormal output which endangers the inmate's life or health if immediate treatment is not commenced, a physician must consider whether to administer forced medical treatment. See 28 CFR §549.65(a). If efforts to convince the prisoner to accept treatment fail and the physician determines that a medical necessity for immediate treatment of a life or health threatening situation exists, the physician may order such treatment without the consent of the inmate. See 28 C.F.R. §549.65(c).

to eat. See id. at Attachment D. Medical personnel repeatedly reminded plaintiff of the serious adverse medical consequences of refusing to eat. Id. at Attachments D & E. On April 5, 2006, plaintiff stated that he would end his hunger strike and did in fact eat an institutionally prepared meal. Paper No. 4, Exhibit 1.

Medical and mental health staff have determined that plaintiff does not require in-patient treatment at a Bureau of Prisons Medical Center. Exhibit 1 at 4, ¶ 14, see also Attachment. He is receiving appropriate mental and medical care. See id. In the event his mental health or medical needs change, his situation will be re-evaluated. See id; see also Exhibit 2 at 12-13, ¶12.

II. Analysis

To the extent plaintiff intended to allege an excessive force claim, he relied on the Eighth Amendment to stop forced feedings medically necessitated by his self-destructive behavior. As counsel for defendant cogently explained in his response, "[p]laintiff's conduct and his complaint to the Court have in essence pitted different aspects of the Eighth Amendment against each other." Paper No. 3 at 2. As plaintiff's custodian, the Warden has a constitutional obligation to secure plaintiff's welfare. Government has an "obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103 (1976). To this end, the Bureau of Prisons (BOP) is charged with providing "suitable quarters" and "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States..." 18 U.S.C. § 4042(a)(2).

The Eighth Amendment also protects inmates from inhumane treatment and conditions while imprisoned. "[W]henever prison officials stand accused of using excessive physical force...

5

the core judicial inquiry is... whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). In making this determination, a court must look at: the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. See Whitley v. Albers, 475 U.S. 312, 321 (1986).

Courts have upheld the authority of prison officials to treat prisoners whose medical condition is life threatening. For example, the United States Court of Appeals for the Second Circuit issued an order to administer medical procedures to force feed inmates on a hunger strike. See Grand Jury Subpoena John Doe v. U.S., 150 F.3d 170, 172 (2nd Cir. 1998) (stating "we, like the majority of courts that have considered the question, hold that such an order does not violate a hunger-striking prisoner's constitutional rights....Other compelling governmental interests, such as the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline, outweigh the constitutional rights asserted by Doe in the circumstances of this case.) (Citations omitted). In Martinez v. Turner, 977 F. 2d 421, 422 (8th Cir.), the Eighth Circuit considered the constitutionality of force feeding a pretrial detainee in a Bivens-type action challenging a violation of due process. Noting that medical officers had determined force feeding medically necessary, the Eighth Circuit ruled: "The mere allegation of forced-feeding does not describe a constitutional violation. Bureau of Prison regulations authorize medical officers to force-feed an inmate if they determine that the inmate's life or permanent health is in danger." Id. at 423.

Under the circumstances presented here, the administration of food through the NGT was neither malicious nor sadistic, Hudson, 503 U.S. at 5, but predicated on documented medical evidence indicating intervention was medically necessary to avoid long-term health damage to plaintiff and to preserve his life. Contrary to plaintiff's allegations, there is no evidence to support his claim that prison staff intended to torture him. Further, the medical intervention was limited. Each time plaintiff was involuntarily fed, Dr. Moubarek had determined that such action was medically necessary. Paper No. 3, Exhibit 2, Attachment D. Notably, all that plaintiff needed to do, and ultimately did, to end the involuntary feeding was to discontinue his hunger strike.

The intent of this complaint was to end plaintiff's involuntary feeding through a nasogastric tube. Accordingly, plaintiff has already obtained the relief sought in the complaint. Under Article III of the Constitution, courts have jurisdiction only over actual cases and controversies that affect the rights of the parties. See Cardinal Chemical Co. v. Morton International, Inc.-, 508 U.S. 83, 97 (1993). The Supreme Court has instructed that "[i]n general, a case becomes moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome." Murphy v. Hunt, 455 U.S. 478, 481 (1982). Under the facts presented here, the complaint is moot, and the court will grant the motion to dismiss.

| | |
|---|---|
| __May 23, 2006__ | __/s/__ |
| Date | Catherine C. Blake |
| | United States District Judge |